## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

COREY L.,[1]

      **Plaintiff,**

v.

      **Case No. 3:24-CV-00291-NJR**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## <u>MEMORANDUM AND ORDER</u>

**ROSENSTENGEL, Chief Judge:**

Corey L. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the following reasons, the Commissioner's decision is reversed in part.

### PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI in January 2021, alleging an onset date of December 10, 2020. (Tr. 386-396). Plaintiff based his claim on his chronic back pain, arthritis of the right foot, obesity, and depressive disorder. (Tr. 22). The application was initially denied on June 11, 2021. (Tr. 224-227). Plaintiff timely requested reconsideration and received a reconsideration decision affirming the previous denial on December 18, 2021. (Tr. 235-236, 237-243). Plaintiff then requested a hearing, and Administrative Law

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the accompanying Advisory Committee Notes.

Judge ("ALJ") Joyce Frost-Wolf held a hearing on October 26, 2022, at which Plaintiff, his attorney, and a vocational expert appeared. (Tr. 79-115).

The ALJ issued an unfavorable decision on November 17, 2022, finding that Plaintiff was not disabled because he had the residual functional capacity ("RFC") to perform light work with slight physical limitations and time restrictions for walking and standing, and he could perform a significant number of jobs in the national economy under sections 216(i) and 223(d) of the Social Security Act. (Tr. 197-212). Plaintiff subsequently sought review with the Appeals Council, who remanded Plaintiff's file for another hearing. (Tr. 218-223). A different ALJ, Katherine Jecklin, held a second hearing on September 25, 2023, at which Plaintiff, his attorney, and a vocational expert appeared. (Tr. 50-76). The ALJ issued an unfavorable decision a month later. (Tr. 17-43). The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the agency's final decision for purposes of judicial review. (Tr. 1-6).

Plaintiff now appeals the second ALJ's decision directly to this Court, raising four points: (1) the ALJ failed to properly evaluate medical opinion evidence, (2) the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain, (3) the RFC finding was not supported by substantial evidence, and (4) the ALJ failed to consider or evaluate Plaintiff's migraine headaches. (Doc. 17). The Commissioner timely filed a brief in opposition. (Doc. 23).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for

a rehearing." 42 U.S.C. § 405(g). The scope of review is limited and, "[t]he findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall

be conclusive[.]" *Id.* Accordingly, this Court is not tasked with determining whether

Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were

supported by substantial evidence and whether any errors of law were made. *Lopez ex rel.*

*Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial

evidence as "more than a mere scintilla" and means only "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*,

587 U.S. 97, 103 (2019) (internal citations omitted).

In reviewing for substantial evidence, the entire administrative record is taken into

consideration, but the reviewing court may not "reweigh the evidence, resolve debatable

evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's

determination[.]" *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "An ALJ need not

specifically address every piece of evidence, but must provide a 'logical bridge' between

the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021). When

an ALJ ignores an entire line of evidence contrary to the ruling, however, it becomes

impossible for a district court to assess whether the ruling rests on substantial evidence.

*Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Golembiewski v. Barnhart*, 322 F.3d 912, 917

(7th Cir. 2003). Ignoring evidence in this way requires the district court to remand to the

agency. *Golembiewski*, 322 F.3d at 917.

### DISABILITY UNDER THE SOCIAL SECURITY ACT

To qualify for disability benefits, a claimant must be disabled within the meaning

of the applicable statutes.[2]  Under the Social Security Act, a person is disabled if he or she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for *any* consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)) (emphasis in original).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by medically acceptable diagnostic techniques. *See* 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that is both substantial and gainful and involves performing significant physical or mental activities for pay or profit. 20 C.F.R. § 404.1572.

To render a decision after a Social Security hearing, an ALJ considers five questions in determining whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment meet or equal any impairment listed in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's residual functional

---

[2]  The statutes and regulations governing DIB and SSI are codified separately, but those relevant to this case are practically identical. Thus, except where otherwise appropriate, the Court will refer only to the regulations governing disability benefits found at 20 C.F.R. §§ 404.1500-404.1599. The equivalent SSI regulations may be found at 20 C.F.R. §§ 416.900-416.999. Moreover, the relevant statute for DIB is 42 U.S.C. § 423, and the relevant statute for SSI is 42 U.S.C. § 1382, 1382c.

capacity leave him or her unable to perform his or her past relevant work? and (5) Is the

claimant unable to perform any other work existing in significant numbers in the national

economy? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the

claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative

answer at any step, other than at step three, precludes a finding of disability. *Id.* The

claimant bears the burden of proof at steps one through four. *Milhem v. Kijakazi*, 52 F.4th

688, 691 (7th Cir. 2022). Then the burden shifts to the Commissioner to show the

claimant's ability to engage in other work existing in significant numbers in the national

economy. *Id.*

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing

this Memorandum and Order. The following summary of the record is directed to the

points raised by Plaintiff.

## I.      Relevant Medical Records

Concerning his physical ailments, Plaintiff sought treatment for back pain on

December 8, 2020, just before his alleged onset date. (Tr. 599-603). At this visit, the treating

physician diagnosed Plaintiff with osteoarthritis of the cervical spine, flexural eczema,

and mixed dyslipidemia. (Tr. 602). For the spinal issues, Plaintiff was referred to pain

management. (*Id*.). The following week, Plaintiff presented to the emergency room with

more complaints of back pain and dermatitis on his hands. (Tr. 655-660, 1079-1086). In

this visit, Plaintiff denied neck stiffness (though other notes catalogue positive

endorsement of neck pain), extremity numbness or weakness, and inability to ambulate. (Tr. 656-657). The physical examination revealed no abnormal physical or mental symptoms, and Plaintiff received a Hydrocodone-acetaminophen ("Norco") prescription. (Tr. 658-659, 1079-1086). To address his back pain, Plaintiff visited a chiropractor four times over the next two weeks. (Tr. 663-677). In these appointments, Plaintiff rated his discomfort as severe describing the pain as aching, deep, dull, intolerable, shooting, stabbing/throbbing, stiff, tight, sharp, heavy, pulling, and annoying throughout his back. (Tr. 663, 665, 667, 669, 672). According to the documentation, Plaintiff's condition did not change significantly from this treatment. (Tr. 663-670).

At an annual exam in January 2021, Plaintiff reported ongoing lower back pain and stiffness that worsens with walking, flexion, and twisting. (Tr. 730-734, 756-760, 813-817). Upon physical examination, his treating physician noted bilateral lumbar pain and paraspinous tenderness and diagnosed lumbago with sciatica on the left side, palpitations, and a history of deep vein thrombosis of the left calf. (Tr. 732, 756-760, 813-817). Plaintiff's physician ordered blood tests, an electrocardiogram, and a magnetic resonance image ("MRI") of the lumbar spine. (Tr. 733-734, 756-760, 813-817).

Within the next two weeks, Plaintiff attended a telemedicine pre-diabetes screening visit and received a lumbar MRI. (Tr. 685-686, 727-729, 741-742, 753-755, 810-812, 870-871). The MRI showed degenerative changes of the lumbar spine with moderate spinal canal narrowing and a possible impingement of an exiting nerve root. (Tr. 685-686, 870-873). The following month, in March 2021, Plaintiff met with Dr. Adrian Feinerman, a consultative examiner for the Bureau of Disability Determination Services.

(Tr. 699-717). While logging mostly normal findings, Dr. Feinerman noted decreased range of motion in the lumbar spine, use of a cane for balance (though Plaintiff could ambulate 50 feet unassisted), and mild limitations in tandem walking, standing on toes, and standing on heels. (Tr. 704-705). Dr. Feinerman diagnosed degenerative joint disease. (Tr. 705). Plaintiff also reported his need for an assistive device for ambulation during a mental status exam the same month. (Tr. 690). Plaintiff continued to receive treatment for his chronic lower back pain over the following month and received a refill of Eliquis, an anticoagulant. (Tr. 723-726, 749-752, 806-809).

Starting in April through June 2021, Plaintiff visited a spine clinic for his persisting neck and back pain. (Tr. 779-781, 951-961, 1312-1317). Exam notes from the initial appointment indicate a positive Spurling's test, Tinel's test, straight leg test, and contra lateral straight leg test. (Tr. 780). Cervical x-rays revealed osteophyte formation at C4/C5, C5/C6, and C6/C7 levels. (Tr. 780, 953, 957, 960-961, 1312-1317). The clinic diagnosed Plaintiff with cervical spondylosis and lumbar degenerative disc disease, referred him for a pain management consultation and physical therapy, prescribed Flexeril, Gabapentin, and Tramadol, and recommended ice/heat therapy, stress and weight reduction, light stretching, and a home exercise regimen. (Tr. 781, 951-953, 1312-1317). Throughout the same time period, Plaintiff followed up with previous providers to monitor and treat his ongoing low back pain and other ailments, like eczema, chest pain, and prediabetes. (Tr. 795-797, 798-801, 802-805, 806-809, 881-911). Each visit had similar findings to his previous appointments. (*Id.*).

In August 2021, Plaintiff visited a new provider again describing his tenacious low

back pain and seeking a physical therapy referral. (Tr. 777, 782, 1439-1441). The documentation of this appointment reflects no abnormal physical exam results and normal ambulation. (Tr. 782, 1439-1441). The treating provider diagnosed chronic, uncontrolled low back pain, prescribed Tylenol, and referred Plaintiff to physical therapy with instructions to return to the clinic three to four weeks later. (Tr. 1439-1441). Plaintiff also received prescription strength Tylenol at his follow-up appointments. (Tr. 1430, 1433, 1436). Over the next month, Plaintiff engaged in physical therapy 10 times, reporting only slight improvement in pain. (Tr. 842-844, 852-869, 1035-1069). Plaintiff initially reported that physical therapy was helping. (Tr. 1429, 1432).

Plaintiff visited physicians in September and October 2021 to discuss disability paperwork, and he complained of ongoing lower back pain with minimal improvement and lower extremity weakness. (Tr. 1425-1430). His physical exams confirmed reduced strength in his bilateral lower extremities and lumbar and paraspinal tenderness. (*Id.*). In the September appointment, he displayed normal ambulation. (Tr. 1430). But in the October appointment, he showed slow and painful ambulation along with difficulty standing. (Tr. 1427). Plaintiff was advised to continue physical therapy. (Tr. 1427, 1430). In November 2021, Plaintiff presented for medication refills and displayed slowed and painful ambulation, reduced bilateral lower extremity strength, lumbar paraspinal tenderness, and difficulty standing. (Tr. 1422-1424). He received a pain management referral for his back pain. (*Id.*). In a follow-up appointment, Plaintiff reported no improvement with physical therapy and increased difficulty with gait and lifting. (Tr. 1418-1420). Again, he received a referral to an interventional pain medicine specialist.

(*Id.*).

Plaintiff's struggle with lower back pain continued throughout the next year. During a physical examination in January 2022, Plaintiff exhibited slow and painful ambulation, reduced bilateral lower extremity strength, difficulty standing, and paraspinal and lumbar tenderness. (Tr. 1414-1417). He also began complaining of bilateral knee pain, but x-rays revealed only small joint effusion in the right knee with no other abnormalities. (Tr. 983-984, 1414-1417). Plaintiff also maintained full range of motion in the knees. (Tr. 1414-1417). He reported the use of a cane for ambulation, and his treating physician made a note to order a cane. (*Id.*). Plaintiff also received a Diclofenac prescription for his knee pain. (*Id.*).

In a follow-up appointment for his chronic pain, Plaintiff again described back and knee pain with continued disruption to his ambulation and standing, while also endorsing right big toe pain. (Tr. 1408-1411). Providers suspected osteoarthritis and referred Plaintiff to a pharmacist for pain management. (*Id.*). Another provider assessed Plaintiff with unspecified polyarthritis, unspecified knee pain, and pain in the right foot. (Tr. 963-965). In February 2022, Plaintiff acquired a disability placard for his vehicle. (Tr. 966-967). Around the same time, Plaintiff visited his physician for his low back, knee, and right toe pain, where he received advice to increase exercise for his lower back, a prescription for Amitriptyline, and a prescription for Diclofenac gel for his knee and toe. (Tr. 1400-1403). He also reported that he used a cane at times. (Tr. 1402). Plaintiff's symptoms persisted into March 2022, but his providers did not adjust his plan of care other than to prescribe a lidocaine patch. (Tr. 968-969, 1381-1384, 1388-1395). The

following month, Plaintiff continued to report pain in his back, knee, and foot, and displayed slowed and painful ambulation, reduced bilateral lower extremity strength, difficulties standing, and paraspinal lumbar tenderness. (Tr. 1377-1380). Plaintiff was referred to physical therapy and scheduled for an MRI. (*Id.*). The MRI revealed multilevel degenerative disc disease. (Tr. 872-873, 981-982). Shortly after the MRI, Plaintiff received a new prescription for Duloxetine. (Tr. 1374-1376).

Plaintiff's complaints of lower back pain and knee pain were continually monitored from May to September 2022, with no change to his plan of care, other than a minor adjustment to the timing and dose of his Duloxetine prescription in mid-June and early-August 2022. (Tr. 970-972, 1335-1338, 1339-1342, 1347-1350, 1351-1354, 1359-1365, 1366-1369, 1579-1586). Along with his ongoing pain, in August and September 2022, Plaintiff's physician diagnosed him with diabetes mellitus, hyperlipidemia, hypertension, and deep venous thrombosis. (Tr. 1322-1334, 1570-1578).

In September 2022, Plaintiff visited the emergency department complaining of right knee and back pain after slipping in the shower. (Tr. 980, 1017-1020, 1479-1482). An x-ray revealed no acute abnormalities. (Tr. 980, 1019, 1481, 1591). His treating physician administered a Lidocaine patch, Norco, and Baclofen to alleviate Plaintiff's symptoms. (Tr. 1017-1020, 1479-1482).

Regular monitoring appointments for Plaintiff's complaints of back and knee pain continued from September 2022 to May 2023. (Tr. 1493-1500, 1505-1514, 1519-1522, 1527-1535, 1540-1552, 1557-1561, 1570-1574). During these appointments, Plaintiff continued to present with low back pain, weakness, and tenderness, along with obesity

and other ailments. (*Id.*). He displayed normal ambulation in some appointments and an antalgic gait in others. (Tr. 1495, 1499, 1508, 1512, 1521, 1533, 1542, 1546, 1551, 1559, 1572). He received a prescription for Pregabalin to help with pain management and another referral to physical therapy. (Tr. 1495, 1500, 1508, 1547, 1560). Plaintiff also received a right-hand x-ray in May 2023 revealing first interphalangeal joint osteoarthritis. (Tr. 1590). In addition, in August 2023, Plaintiff underwent bilateral knee x-rays, which showed no acute findings. (Tr. 1589-1590).

The same month, Dr. Mirabel Inyang completed an attending physician's progress statement confirming that Plaintiff "[c]ontinues to be totally disabled from low back pain and is still being regularly treated by [her]." (Tr. 1609). Dr. Inyang imposed the following restrictions: avoid lifting, bending, squatting, and long periods of ambulation. (*Id.*). In September 2023, Dr. Mazhar Lakho completed a summary impairment questionnaire regarding his monthly treatment of Plaintiff over the past year. (Tr. 1611-1613). Dr. Lakho listed Plaintiff's diagnoses as degenerative disc disease, chronic arthritis, depression, and blood clotting disorder due to Factor 5, and Plaintiff's symptoms as chronic low back pain, unsteady gait, and insomnia. (Tr. 1611). According to Dr. Lakho, Plaintiff would need to elevate one or both legs above the waist and lie down in a supine position during a workday. (*Id.*). Moreover, Plaintiff could only sit for one hour, stand or walk for zero to one hour, and occasionally lift or carry up to five pounds in a workday. (Tr. 1611-1612). Dr. Lakho indicated that Plaintiff requires a cane while standing and has difficulty performing fine or gross movement effectively on a sustained basis. (*Id.*). Lastly, Dr. Lakho estimated that Plaintiff's conditions would cause his absence from work more than

three times per month. (Tr. 1612).

As to mental health treatment, Plaintiff underwent a mental status evaluation on March 5, 2021, with a consultative examiner, David NieKamp, Psy. D. (Tr. 689-696). Dr. NieKamp noted sufficient independence with personal hygiene, chores, errands, cooking, and cleaning, and no history of thought disorder, but also chronicled irritability, poor sleeping patterns, daily crying spells, feelings of hopelessness, bouts of apathy, isolation, poor focus and concentration, and poor short-term memory. (Tr. 691). Ultimately, Dr. NieKamp diagnosed Plaintiff with moderate to severe levels of depression. (Tr. 693).

In August 2021, Plaintiff participated in a follow-up depression screening. (Tr. 783-785, 1437-1441). At this appointment, Plaintiff reported increased sleep, decreased energy, decreased interests, increased agitation, and feelings of guilt. (Tr. 784, 1438). Plaintiff also displayed soft and slowed speech, along with a sad mood and affect. (*Id.*). Other notes from the mental status examination indicate calm demeanor, cooperative behavior, good eye contact, no hallucinations, intact cognition and memory, full orientation, average intelligence, intact judgment, insight, and thought processes, no suicidal or homicidal ideation, and intact motor activity. (Tr. 784, 1437-1441). His examiner recommended a follow-up visit with a psychiatrist. (*Id.*). At a follow-up appointment, Plaintiff was diagnosed with depressive disorder and prescribed Zoloft. (Tr. 1434-1436). His Zoloft prescription was renewed in January 2022, after a telehealth visit for depression. (Tr. 1411-1413).

Over the next several months, from February to June 2022, Plaintiff participated in

multiple telehealth mental health follow-up appointments, where the only abnormal symptoms recorded during the mental status exams were sullen and sad affect. (Tr. 1343-1346, 1355-1358, 1370-1373, 1385-1387, 1396-1398, 1404-1408). During these appointments, providers assessed Plaintiff as having major depressive disorder and recommended continued counseling. (Tr. 1385-1387, 1396-1398, 1404-1408). At his physical health appointments during this time, Plaintiff was prescribed Sertraline and Amitriptyline after his complaints of depression and chronic pain, and, later on, Duloxetine for both pain and mood benefit. (Tr. 1376, 1403). Similarly, from September 2022 to May 2023, Plaintiff participated in periodic monitoring appointments for his depression. (Tr. 1489-1492, 1501-1504). He still presented a sullen affect, with the exception of his appointment in October 2022 where he presented a pleasant and happy affect, and his diagnoses and care plans remained the same. (Tr. 1318-1321, 1489-1491, 1515-1518, 1523-1526, 1536-1539, 1553-1556, 1562-1569).

In November 2022, Dr. Albert Kombe completed a psychiatric medical source statement on Plaintiff's behalf. (Tr. 1442-1444). The statement documentation included primarily check box questions with a few fill-in-the-blank prompts. (*Id.*). Dr. Kombe stated that he saw Plaintiff monthly from August 2021 to October 2022, and recorded Plaintiff's diagnosis as severe recurrent depression without psychotic features. (Tr. 1442). In the report, Dr. Kombe indicated that Plaintiff would likely be absent from work due to his depression more than three times per month. (Tr. 1442). Dr. Kombe also checked "marked" and "extreme" for every listed category of mental activity. (Tr. 1443). The form did not provide any additional space for a narrative explanation of Dr. Kombe's

selections. (Tr. 1442-1444).

## II.    State Agency Examiners

Turning back to March 2021, a state agency consultant, John Peterson, M.D.,
reviewed Plaintiff's medical file. (Tr. 124-129, 141-146). Dr. Peterson opined that Plaintiff
exhibited exertional limitations such that he could occasionally lift or carry 20 pounds, he
could frequently lift or carry 10 pounds, and he could stand, walk, or sit for about six
hours in a normal workday. (Tr. 126, 143). Further, Dr. Peterson assessed that Plaintiff
had postural limitations such that he could occasionally climb ramps and stairs, never
climb ladders, ropes, or scaffolds, frequently balance, and occasionally stoop, kneel,
crouch, and crawl. (Tr. 127, 144). Dr. Peterson also identified a manipulative limitation in
reaching overhead. (Tr. 127-128, 144). In explaining these conclusions, Dr. Peterson
highlighted Plaintiff's multilevel degenerative joint disease and limited range of motion
in the lumbar spine along with his cane use but noted Plaintiff's ability to walk greater
than 50 feet unassisted and normal gait. (Tr. 126-129, 143-146). State agency examiner,
Brenda Affinati, M.D., reached the same conclusion in December 2021. (Tr. 167-170,
186-191).

As to mental health, a state agency consultant, David Voss, Ph.D., reviewed
Plaintiff's file related to mental health and provided an opinion in March 2021.
(Tr. 116-124, 133-141). Dr. Voss opined that Plaintiff exhibited only a mild limitation in
interacting with others, concentrating, persisting, or maintaining pace, or adapting or
managing oneself due to any mental impairment. (Tr. 123-124, 140-141). At the
reconsideration level, Dr. Maria Yapondijian-Alvarado, Psy.D., agreed that Plaintiff had

a mild limitation in the same areas along with a mild limitation in understanding,
remembering, or applying information. (Tr. 162-165, 183-186).

### III.    Evidentiary Hearings

In Plaintiff's first evidentiary hearing, on October 26, 2022, Plaintiff appeared via
video before ALJ Joyce Frost-Wolf and was represented by counsel. (Tr. 77-115).
Vocational expert Donna Mancini also testified by video. (*Id.*).

Plaintiff testified that he earned a college degree from the University of Illinois at
Urbana-Champaign for business administration. (Tr. 86-87). Plaintiff previously worked
as a margin associate at a bank helping out clients at different branches over the phone
and processing paperwork on the computer. (Tr. 87-89). He mostly sat during his job, but
in his last six months he procured a standing desk, which did not seem to help him.
(Tr. 88). If he were to resume this role now, he expressed that he could not concentrate or
stay focused as the job requires and would need many breaks. (Tr. 95-96). He also worked
at the post office as a mail handler assistant, which required him to push up to 80 pounds
of mail overnight and remain on his feet during his shift. (Tr. 89). But within ten months,
he missed 20 days and needed multiple extended breaks. (Tr. 95).

As to his daily life during the relevant time, Plaintiff reported that he lived with
his aunt, and she completed most of the household chores with him throwing the
occasional load of laundry in the washer. (Tr. 89). He stated that he does not require
assistance with personal care. (*Id.*). When asked about his typical daily activities, Plaintiff
described that he watched television but could not complete an entire movie at once due
to sitting and fatigue, and that he engaged in social media and talked with friends on his

phone. (Tr. 90). To mitigate discomfort, Plaintiff explained that he alternated positions by reclining or laying down and used a massage gun for several hours a day. (Tr. 91). Other treatments, like creams, heat, or ice, provided only temporary relief. (*Id.*). Due to his blood clotting disorder, Plaintiff was reluctant to participate in surgery or injections to relieve his recurring pain, but he visited a pain management specialist. (Tr. 91-92). He also used an unprescribed cane to help with balance. (Tr. 98).

As to his mental health, Plaintiff testified that he struggled with depression and loneliness, especially since the death of his mother in 1998. (*Id.*). He explained that part of his depression related to his current medical circumstances, his inability to work, and the financial stress associated with that. (Tr. 93). He made clear his desire to work but his physical and mental inability to do so. (Tr. 94).

Donna Mancini, the vocational expert, testified that Plaintiff's past role as a mail handler assistant ranged from unskilled to semiskilled work and was heavy as performed, and his past role as a margin clerk qualified as skilled work and was sedentary as performed. (Tr. 101). Mancini testified that an individual with Plaintiff's limitations could perform as a margin clerk. (Tr. 102-103). For unskilled positions, she also testified that an individual with Plaintiff's limitations could perform roles such as a marker, office helper, or collator operator. (Tr. 103-104). Mancini's assessment remained the same even given standing limitations for only four hours per day and only 30 minutes at a time. (Tr. 104-106). When given a limitation to maintaining attention and concentration for simple tasks, Mancini stated the past work would not be available, but unskilled roles such as a marker, office helper, or collator operator would still be

Page 16 of 40

manageable. (Tr. 107).

After the appeals counsel remanded Plaintiff's case, Plaintiff appeared via video and was represented by counsel at a hearing on September 25, 2023, before ALJ Katherine Jecklin.[3] (Tr. 50-76). Vocational expert Tavores Boyd testified via phone. (*Id.*).

Building from the last hearing, Plaintiff updated the ALJ as to his symptoms and testified that his lower back pain had worsened. (Tr. 59). He also reported an increase in his pain medication to 10 milligrams of Hydrocodone three times per day. (Tr. 59-60). Even so, according to Plaintiff, the medication only helps for about four hours. (Tr. 61). He reiterated that his blood clotting disorder prevents him from pursuing surgical solutions. (Tr. 60-61). Plaintiff expressed that his middle back and neck issues have also caused more pain since the last hearing. (Tr. 61). To avoid activities that trigger increased pain, Plaintiff refrains from walking, taking stairs, and getting in and out of the car. (Tr. 62). Plaintiff also provided an update as to his foot pain stating that he has constant pain from arthritis in his right big toe. (Tr. 62-63). He estimated that he could only stand for five minutes before needing a chair. (Tr. 63). On a regular day between 9:00 a.m. and 5:00 p.m., Plaintiff appraised that he spends about six hours laying or reclining. (Tr. 64).

Plaintiff testified that he relied on a prescribed spring cane to assist with standing and balance. (Tr. 63). With the cane, he stated he could stand about five to ten minutes without needing a chair. (Tr. 63-64). Plaintiff claimed to use the cane once per day, as he only goes out once per day. (Tr. 67). And typically, Plaintiff only left the house two to

---

[3] The beginning of the transcript states that Plaintiff attended this hearing in person (Tr. 52), but later in the transcript the ALJ explains that Plaintiff had a right to an in-person hearing but opted to proceed by video. (Tr. 56). The ALJ also makes clear that the vocational expert appeared by phone. (Tr. 52).

three times per week. (*Id*.). He stated that he used the cane occasionally around the house, but he usually sat on the couch. (*Id*.).

As to his mental health treatment, Plaintiff reported that he had been treating his depression for over a year and noted previous adjustments to his medications. (Tr. 64-65). He testified that his depression caused a noticeable lack of focus, concentration, and interest in activities that he used to enjoy. (Tr. 65-66). Plaintiff also avoided people and stayed to himself. (Tr. 66). He noticed more forgetfulness. (*Id*.).

Plaintiff also discussed a disturbance in his living situation. At the prior hearing, he lived with his aunt, but because she relocated, Plaintiff faced homelessness in two weeks and would have to live out of his car. (Tr. 67-68).

Tavores Boyd, the vocational expert, testified that an individual with Plaintiff's limitations would be able to perform his past work as a margin clerk, and that such an individual could perform other unskilled, light exertional jobs such as marker, routing clerk, and order caller. (Tr. 69-70). Boyd stated that the use of a cane would not change his assessment regarding the type and number of available jobs for such an individual. (Tr. 70). Boyd testified, however, if the individual was limited to simple tasks in a routine work environment and simple work-related decisions, then Plaintiff's past work would be eliminated, but the roles of marker, routing clerk, and order caller would remain available. (Tr. 70). Boyd also testified that a general requirement for a person to perform light work is an ability to stand or walk in combination of at least six hours and the ability to ambulate without an assistive device. (Tr. 73).

If the individual was restricted to sedentary, as opposed to light, exertional jobs,

Boyd stated that Plaintiff's past work as a margin clerk would remain available, even

with the use of a cane. (Tr. 70-71). But again, if the individual was limited to simple tasks

in a routine work environment and simple work-related decisions, then the past work

would be eliminated. (Tr. 71). As to tolerated time off task and absences in unskilled

work, Boyd reported that employers typically allow a maximum of ten percent of time

off task in an eight-hour workday and one day per month of absenteeism. (Tr. 71-72).

DECISION OF THE ALJ

In reaching her decision, the ALJ considered the hearing, including testimony from

Plaintiff and the impartial vocational expert. She also considered Plaintiff's medical

records and the opinions of Dr. Inyang, Dr. Lakho, Dr. Peterson, Dr. Affinati, Dr. Kombe,

Dr. Voss, and Dr. Yapondijian-Alvarado.

At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful

activity since December 10, 2020, the alleged onset date. (Tr. 22). At step two, the ALJ

determined that Plaintiff's lumbar, thoracic, and cervical degenerative disc disease,

arthritis of the right first metatarsophalangeal joint, obesity, and depressive disorder

constituted severe impairments. (Tr. 22-23). At step three, the ALJ found that Plaintiff's

impairment or combination of impairments (both physical and mental) did not meet or

medically equal the severity of one of the impairments listed in the regulations. (Tr. 23-24).

As to his physical impairments, the ALJ acknowledged that Plaintiff's primary

care provider prescribed a cane in 2022, but in reviewing the entire record, she found no

significant, consistent, or ongoing use of the cane. (Tr. 24). She also determined that the

record lacked any evidence that Plaintiff had an inability to use one upper extremity and

Page  19  of  40

required an assistive device using the other upper extremity. (*Id.*). As to his mental impairment, the ALJ assessed a moderate limitation in understanding, remembering, or applying information. (Tr. 25-26). The ALJ determined Plaintiff suffered a mild limitation in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing himself. (Tr. 26).

The ALJ also concluded that Plaintiff had the RFC to perform light work, with the following limitations: (1) Plaintiff can occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; (2) Plaintiff can never climb ladders, ropes, or scaffolds; (3) Plaintiff can occasionally reach overhead with the bilateral upper extremities; (4) Plaintiff can perform work requiring no concentrated exposure to hazards, such as unprotected heights; and (5) Plaintiff can perform simple tasks in a routine work environment and make simple work-related decisions. (Tr. 27). In making this finding, the ALJ considered Plaintiff's testimony regarding his symptoms and found that his medically determinable impairments could reasonably be expected to cause the alleged symptoms. (Tr. 27). The ALJ concluded, however, that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 28).

At step four, the ALJ determined that Plaintiff is unable to perform the requirements of his past relevant work as a margin clerk or postal service clerk. (Tr. 41). The ALJ relied on the vocational expert's testimony that a person of Plaintiff's age, education, and work experience subject to the assessed RFC could not perform this past relevant work. (*Id.*). Finally, at step five, the ALJ concluded that, based on the testimony

of the vocational expert, "considering [Plaintiff's] age, education, work experience, and residual functional capacity, [Plaintiff] is capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (Tr. 42). Specifically, the ALJ determined that Plaintiff could perform the roles of marker, routing clerk, and order caller. (*Id.*).

Considering all of the above, the ALJ found Plaintiff was not under a disability, as defined in the Social Security Act, from December 10, 2020, through October 24, 2023, the date of her decision. (Tr. 42-43).

DISCUSSION

## I.    Did the ALJ properly evaluate medical opinion evidence?

Plaintiff argues that the ALJ failed to properly evaluate the medical opinions in the record because she failed to articulate how she considered the factors of supportability and consistency in determining persuasiveness. Moreover, Plaintiff contends that the ALJ misunderstood the definitions of supportability and consistency, which tainted her application of those factors. Plaintiff also urges that the ALJ relied only on normal exam findings while ignoring the abnormal or positive findings within the referenced exams.

While an ALJ must consider opinions offered by medical experts, she is not bound by those opinions, but rather evaluates them in the context of the expert's medical specialty and expertise, supporting evidence in the record, and other explanations regarding the opinion. *Haynes v. Barnhart,* 416 F.3d 621, 630 (7th Cir. 2005). The ALJ must "consider the supportability of the opinion, the consistency of the opinion with the record

as a whole, including other medical opinions, and any explanation for the opinion provided by the state agency medical or psychological consultant or other program physician or psychologist." *Id.* When the record contains well-supported evidence contradictory to a treating physician's opinion, that opinion is just one more piece of evidence for the ALJ to weigh. *Hofslien v. Barnhart*, 439 F.3d 375, 376-77 (7th Cir. 2006). Under the very deferential standard, an ALJ must minimally articulate her reasons for discounting a physician's opinion after considering the relevant factors in the Social Security regulations. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008).

Here, the ALJ considered the objective medical opinion evidence for the alleged disability period, using the relevant factors in 20 C.F.R. § 404.1520c, including Dr. Inyang's progress statement, Dr. Lakho's findings, Dr. Kombe's medical source statement, and the reports of the state agency medical and psychological consultants.

As to Dr. Inyang's progress statement from August 2023, the ALJ found the opinion unpersuasive because of its vagueness in simply restricting Plaintiff to avoid lifting, bending, squatting, and long periods of ambulation without further explanation or reference to specific impairments. According to the ALJ, the progress statement lacked specific limitations (i.e. lifting up to a certain weight or how long Plaintiff could ambulate) which invited subjectivity in determining actual limitations. Plaintiff urges that the ALJ should have interpreted the word "avoid" through its standard definition to keep away or refrain from and should have clarified any ambiguity in Dr. Inyang's restrictions during the hearing. The Commissioner contends that the ALJ had no obligation to evaluate the persuasiveness of Dr. Inyang's statement because it did not

qualify as a medical opinion or address Plaintiff's functional limitations for a period of
12 consecutive months. Even so, the Commissioner argues that the ALJ adequately
gauged persuasiveness.

First, the Court doubts that Dr. Inyang's half-page progress statement solely
imposing restrictions to "avoid lifting, bending, squatting, [and] long periods of
ambulation" qualifies as a medical opinion. The regulations define a medical opinion as
"a statement from a medical source about what you can still do despite your
impairment(s) and whether you have one or more impairment-related limitations or
restrictions" in a claimant's ability to perform physical, mental, and other demands of
work activities and to adapt to environmental conditions. 20 C.F.R. § 404.1513. The
documentation filled out by Dr. Inyang provides no assessment of Plaintiff's abilities and
lists only four broad categories of limitation. It is obvious why the ALJ struggled to
measure the meaning, let alone the persuasiveness, of this progress statement.

Second, even if the Court considered Dr. Inyang's scant note as a medical opinion
endorsing indefinite and unlimited restrictions on lifting, bending, squatting, and
ambulation, the ALJ's characterization of the progress statement as vague essentially
captures the statement's lack of supportability. The progress statement is devoid of any
support for the restrictions aside from reference to "low back pain." Moreover, the record
does not contain any other treatment notes from Dr. Inyang that could provide insight
into her assessment. And while the ALJ does not mention consistency in describing
Dr. Inyang's statement, she does so in evaluating other, more comprehensive medical
opinions that impose similar, albeit more specific restrictions, like Dr. Lakho's. The ALJ

provided adequate rationale in rendering Dr. Inyang's progress statement unpersuasive.

The ALJ also considered an impairment questionnaire completed by Plaintiff's treating physician, Dr. Lakho, in September 2023. In the questionnaire, Dr. Lakho answered a series of questions, primarily through checkboxes and preset scales, indicating that Plaintiff has severe limitations in a variety of categories like sitting, standing, walking, lifting, carrying, handling objects, fine manipulations, reaching, pushing, and pulling. Dr. Lakho also listed Plaintiff's diagnoses (degenerative disc disease, chronic arthritis, depression, and blood clotting disorder) and primary symptoms (chronic low back pain, unsteady gait, and insomnia).

Plaintiff argues that in evaluating Dr. Lakho's opinion the ALJ merely used the words supportability and consistency without explaining how she considered those factors. Plaintiff also criticizes the ALJ for impermissibly highlighting normal exam findings throughout the record without similar reference to the abnormal or positive findings during objective examinations. Notably, Plaintiff fails to point to the relevant abnormal or positive findings that the ALJ should have incorporated. The Commissioner asserts that Dr. Lakho failed to specify the test results or other evidence leading to the extreme limitations levied in his opinion. In addition, the Commissioner emphasizes that the ALJ noted normal and abnormal findings within her comprehensive summary of the medical evidence. Further, the Commissioner urges that the ALJ's opinion should be read in its entirety and is subject to a minimal articulation requirement.

The ALJ explained that this opinion was not at all supported by Dr. Lakho's exam findings from July 6, 2022, and was inconsistent with the record as a whole citing to many

instances of normal exam results. The opinion itself did not present a supporting
explanation or reference objective medical evidence. As such, the ALJ could have deemed
the opinion to lack supportability stopping there. But the ALJ also looked at Dr. Lakho's
most recent exam findings available as a potential source of objective medical support for
the opinion. With no abnormal symptoms reported, the ALJ found the recent exam
findings unsupportive of the drastic limitations announced in Dr. Lakho's opinion.

As to consistency, the ALJ recounted many normal exam results throughout
Plaintiff's medical records. It is true that, in addressing Dr. Lakho's opinion, the ALJ did
not mention abnormal exam findings like lumbar and paraspinous tenderness, use of a
cane for balance, reduced bilateral lower extremity strength, bouts of slowed and painful
ambulation, and difficulty standing. But the ALJ acknowledged these findings in
summarizing the medical evidence earlier on in the decision. The ALJ explained that that
there was no basis for problems with handling, fingering, reaching, pushing or pulling,
and that the medical records lacked abnormal exam findings that relate to those
categories. The ALJ also stated that there was no basis for such an incredible reduction in
sit, stand, and walk durations. Critically, this is different from asserting there was no
basis for *any* reduction in sit, stand, and walk durations, which the abnormal exam
findings likely refute. Separately, the ALJ also discussed that the medical evidence did
not support the ongoing need for an assistive device or cane because the record typically
reflected a normal gait with no mention of the need for an assistive device. This
contradicts the extreme limitations suggested by Dr. Lakho.

Given her analysis, the decision as a whole, and the medical record, the ALJ's

finding is supported and minimally articulates adequate reasons as to the lack of persuasiveness of Dr. Lakho's assessment.

Lastly, regarding physical health, the ALJ discussed the evaluations of two state agency examiners, Dr. Peterson and Dr. Affinati. Each of these examiners reached the same conclusion, and the ALJ analyzed them together. The ALJ found these conclusions persuasive because they were consistent with the medical evidence, and they cited to external sources for rationale. Plaintiff argues that the ALJ relied on the same set of normal physical exam findings without explaining how those findings support the ability to perform light work, as endorsed by the two state agency consultants. The Commissioner emphasizes that the state agency consultants cited voluminous and specific exam results to support their assessment. In addition, the Commissioner points out that the ALJ found greater balancing and environmental limitations than assessed by the state agency examiners.

The ALJ's analysis adequately explains the supportability and consistency of these non-treating medical source opinions. The ALJ reasons that the state agency consultants' opinions are well-supported because they incorporate explanations and citations to external records and sources. The ALJ understood the opinions as consistent with both the medical evidence cited by the state agency examiners and the medical record as a whole. While the ALJ appears to repeat and rely on the same normal exam findings in assessing the medical opinion evidence, there is no requirement that each assessment relate to varied set of exam results. The ALJ makes clear that she found the general pattern of normal exam findings, some of which the state agency consultants mentioned in their

opinions, highly important. The ALJ interpreted that pattern of normal exam findings, in light of Plaintiff's impairments, as showing that Plaintiff does suffer from physical limitations, but that he remains capable of light work. This is an adequate explanation of how the evidence led to the ALJ's conclusion.

As to mental health, the ALJ reviewed Dr. Kombe's psychiatric medical source statement dated November 5, 2022. In the medical source statement, Dr. Kombe identified Plaintiff's diagnosis as severe recurrent depression without psychotic features. Through a series of 29 checkboxes across four areas of mental activity, Dr. Kombe assessed marked or extreme limitations for each prompt and indicated that Plaintiff would likely miss work more than three times per month. The ALJ found the opinion unpersuasive because Dr. Kombe's own findings were benign aside from sullen affect and sad mood. And to the contrary, Plaintiff's mental status exams throughout the medical record reflect predominantly normal results.

Plaintiff claims that the ALJ's decision reflects a misunderstanding of supportability because the ALJ failed to discuss Dr. Kombe's opinion itself, rather than objective medical evidence. Moreover, Plaintiff contends that the ALJ failed to properly evaluate consistency because she only compared the opinion to Dr. Kombe's own mental status exam findings. Plaintiff also emphasizes that the cited findings mostly stemmed from telehealth appointments. On the other hand, the Commissioner suggests that the ALJ understood the meaning of both supportability and consistency and approves the ALJ's evaluation of Dr. Kombe's opinion as proper.

Indeed, Plaintiff's arguments as to Dr. Kombe's opinion are perplexing.

Supportability relates to objective medical evidence and supporting explanations presented by a medical source to support a medical opinion. 20 C.F.R. § 404.1520c(c)(1). Here, Dr. Kombe's medical source statement provided no explanation or citation to external findings as support for his selection of only marked and extreme limitations. The ALJ could have concluded the supportability analysis there. Instead, she looked to Dr. Kombe's own treatment notes to find backing for these severe limitations. The ALJ explained that the records revealed only benign findings aside from a sullen affect or sad mood. Thus, even when the ALJ tried to supplement Dr. Kombe's unexplained conclusions by perusing the treatment notes, Dr. Kombe's opinion lacked support. To be sure, Plaintiff fails to cite any relevant exam finding from Dr. Kombe that the ALJ overlooked.

The regulations provide that consistency relates to evidence from other medical and nonmedical sources that corroborate—or are consistent with—the opinion. 20 C.F.R. § 404.1520c(c)(2). The ALJ cited many examples from the medical record as a whole that conflict with the marked or extreme limitations outlined by Dr. Kombe, including normal exam results by multiple providers. The ALJ did not simply reference Dr. Kombe's findings in reviewing consistency, so Plaintiff's argument is unavailing.

Plaintiff does not raise any issue in the ALJ's evaluation of the state agency psychiatric examiners—Dr. Voss and Dr. Yapondijian-Alvarado. In evaluating these opinions, the ALJ highlights evidence of Plaintiff's soft and slowed speech, sad mood and affect, irritability, impaired sleep, crying spells, social isolation, poor focus, and poor short-term memory to address Plaintiff's mental impairment and the impact on his

functionality. Clearly, the ALJ reviewed Plaintiff's mental health record in its entirety in considering the consistency of Dr. Kombe's and the state agency psychiatric consultants' opinions.

In sum, the ALJ properly articulated her reasons in assessing each medical source opinion. In doing so, she provided insight into the supportability and consistency of each opinion and properly confronted those factors as required.

## II.    Did the ALJ properly evaluate Plaintiff's subjective complaints of pain?

Plaintiff next argues that the ALJ failed to properly evaluate his subjective complaints of pain. Plaintiff charges that the ALJ failed to incorporate specific reasons for the weight given to self-reported symptoms and conflated his activities of daily living with the absence of impairment. According to Plaintiff, the ALJ used only general statements that lack support in the record and failed to discuss relevant factors like the location, duration, frequency, or intensity of his pain, aggravation of his symptoms, the efficacy or side effects of various medications, or the types of treatments he attempted.

To the contrary, the Commissioner argues that the ALJ was not patently wrong in finding unpersuasive Plaintiff's account of his own limitations. To support this assertion, the Commissioner highlights the ALJ's discussion of Plaintiff's inconsistent testimony regarding his need for a cane and the fluctuating documentation of cane use throughout the medical record. The Commissioner also brings attention to the ALJ's discussion of recent exam results in 2022 and 2023 that revealed normal exam findings regarding ambulation, movement of extremities, sensation, and muscle strength. Ultimately, the Commissioner asserts that the ALJ provided enough explanation and support to find

Plaintiff's subjective complaints unpersuasive.

An ALJ's evaluation of a claimant's subjective symptoms is overturned "only if it is patently wrong, which means that the decision lacks any explanation or support." *Hess v. O'Malley*, 92 F.4th 671, 679 (7th Cir. 2024) (citing *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014)). In drawing conclusions, the ALJ must provide enough explanation to convey that the decision was reached in a rational manner, logically based on specific findings and the evidence in the record. *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011). Of course, the ALJ must apply correct legal standards and rely only on substantial evidence, meaning "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 587 U.S. at 103; *Murphy*, 759 F.3d at 816.

The record contains well-documented evidence that Plaintiff sought continual treatment for pain in his lower back, knees, and toe. He underwent MRIs and x-rays, worked with physical therapists and pain management specialists, and received prescriptions for pain medications to address his pain. He also testified that his lower back pain continued to worsen, he increased the frequency of his pain medication, and he avoided walking, taking stairs, and getting in and out of the car. He estimated that he could only stand for five minutes at a time and spent six hours laying or reclining in the span of an average workday. He also reported dependency on his cane when he left the house which occurred two to three times per week.

The ALJ determined that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical evidence of record. In summarizing his relevant medical history, the ALJ

outlined many of Plaintiff's subjective symptoms associated with his physical and mental
health ailments. The ALJ detailed normal and abnormal findings, several prescriptions
for pain medication, and referrals to pain management specialists and physical therapists.
But the ALJ also repeatedly noted that, after many appointments, Plaintiff's treatment
providers discharged Plaintiff without plan of care changes and often continued his
then-current prescriptions. The ALJ also mentioned that in some appointments Plaintiff's
treating physician prescribed exercise to reduce his chronic pain.

In addition, the ALJ found that the reported activities of daily living indicated a
greater functionality than alleged. She highlighted his ability to prepare simple meals,
complete laundry, drive a car, go out alone, shop in stores, handle money, read, watch
television, socialize with others in person and over the phone, and follow instructions for
a recipe. The ALJ also reiterated consistently normal exam findings. She discussed the
lack of support for the need or use of an assistive device. Though Plaintiff received a
prescription for a cane, the ALJ focused attention on Plaintiff's medical records, especially
more recent ones, often reflecting a normal gait, normal ambulation, no mention of need
for or use of an assistive device during appointments, and normal muscle strength.

The ALJ clearly reasoned that Plaintiff's ability to perform activities of daily living
such as cooking, chores, driving, and going to stores contradicted his statements of
extreme limitations in standing or walking. The ALJ did not err in finding that Plaintiff's
alleged daily activities undercut his other testimony like his inability to stand for longer
than five minutes, especially considering that the medical records indicated only
occasional disruptions to ambulation or gait during appointments. Further, the ALJ was

entitled to discredit Plaintiff's alleged dependency on a cane because the medical records often demonstrated normal gait and ambulation. And similarly, the ALJ reasonably concluded that Plaintiff's pain was not as intense as alleged because the objective medical evidence regularly showed normal exam results with unaltered diagnoses and treatment regimens.

Plaintiff also faults the ALJ for failing to discuss the location, duration, frequency, or intensity of his pain, aggravating factors, type, dosage, effectiveness or side effects of his medications, and types of treatment attempted to relieve his symptoms. But Plaintiff does not actually reference any relevant evidence related to these topics that would have influenced the ALJ's assessment. The ALJ recounted the location of Plaintiff's pain (back, knees, and foot), his persistent complaints of such pain, his prescribed medications, and his physical therapy appointments. But the ALJ cannot be expected to discuss what is not in the record. As the ALJ pointed out, treatment providers largely continued Plaintiff on the same treatment plan and medications to address his complaints of pain without mentioning known side effects—Plaintiff intimates none. As such, the ALJ concluded Plaintiff's reports of worsening pain were not reflected through the medical records which reveal the same ongoing reported symptoms, similar exam findings, and virtually the same treatment over time.

The ALJ's assessment of the subjective complaints of pain was not patently wrong. The ALJ achieved minimal articulation of her evaluation of the subjective complaints, along with why she found such reports inconsistent with the record as a whole. The explanation provided conveys that the ALJ arrived at her decision in a rational manner,

logically based on specific findings and the evidence in the record, which is all that is required.

### III.    Is the RFC supported by substantial evidence?

Plaintiff argues that the ALJ erred in relying entirely on state agency physicians from 2021 without fully analyzing the other medical evidence contained in the record, especially the opinion of his treating physician who specializes in lower back pain. Moreover, Plaintiff avers that the RFC mirrors the state agency consulting physicians' opinions with minor changes to occasional balancing from frequent, limitations to avoid concentrated exposure to workplace hazards such as unprotected heights, and the mental health limitations. According to Plaintiff, the reason supporting those changes is unclear. Plaintiff disapproves of the ALJ's apparent reliance on the state agency consultants' opinions because they naturally omit two years of additional medical records developed afterwards. For example, Plaintiff draws focus to two lumbar MRIs that show possible impingement of the exiting right L4 nerve root and central canal and bilateral neural foraminal narrowing, a CT after Plaintiff's complaints of headaches and left arm and leg numbness, physical therapy notes, and the treating doctor's notes and opinions. (*See* Tr. 842-843, 849-869, 870-873, 910).

In crafting the RFC, Plaintiff asserts that the ALJ failed to include all the relevant evidence in the record, and instead, included only the objective portions of the medical records. Plaintiff urges that the ALJ should have included his recorded reports and medical history, especially reports of the type and intensity of his pain and the aggravating factors. And finally, Plaintiff challenges the mental RFC as lacking support.

The decision, according to Plaintiff, fails to clearly explain how the ALJ determined that
Plaintiff could perform simple tasks in a routine work environment and make simple
work-related decisions despite his chronic, severe depression. Plaintiff accuses the ALJ of
impermissibly interpreting the mental status exam findings herself to determine how
they affected Plaintiff's ability to mentally function in the workplace without a similar
assessment from a medical source.

In response, the Commissioner proclaims that Plaintiff's arguments should be
rejected because he fails to identify what limitations the ALJ should have found but
unreasonably omitted from the RFC finding. Taking Plaintiff's arguments in turn, the
Commissioner states that the ALJ permissibly relied on the 2021 opinions of the state
agency physicians because no later evidence containing new, significant medical
diagnoses reasonably could have changed their views. The Commissioner also contends
that the ALJ does not need an expert to review imaging when providers react mildly and
continue with conservative treatment and physical exams remain unremarkable. Further,
the ALJ adopted slightly more limitations than the two state agency physicians imposed.

In accordance with the arguments above related to assessment of subjective
complaints, the Commissioner argues that the ALJ reasonably found Plaintiff's subjective
complaints unpersuasive and was not required to catalogue such complaints to explain
how each affected the RFC finding. As for the mental RFC finding, the Commissioner
avers that Plaintiff wrongly assumes that the RFC must rely on an expert to interpret each
mental exam result. According to the Commissioner, the state agency psychologists
found Plaintiff capable of tasks of any complexity, and the ALJ weighed Plaintiff's

subjective complaints and the mental status exam results to further limit Plaintiff to simple tasks and decisions, which was properly within the ALJ's discretion.

The Commissioner is correct that an ALJ can rely on older assessments unless they become outdated with later evidence containing new, significant medical diagnoses that could reasonably reshape the reviewing physician's opinion. *Bakke v. Kijakazi*, 62 F.4th 1061, 1066-67 (7th Cir. 2023). Older medical assessments can constitute substantial evidence to support an ALJ's decision when the new tests do not necessarily undermine previous medical conclusions. *Id.* at 1067; *see also Baptist v. Kijakazi*, 74 F.4th 437, 442 (7th Cir. 2023). Such is the case here. The additional MRIs, CT, physical therapy notes, and treating physician notes highlighted by Plaintiff did not include the kind of new diagnosis that would undermine previous conclusions. After the imaging and physical therapy, Plaintiff's treating physicians did not substantially alter his diagnoses or his course of treatment in response. As such, the ALJ was entitled to rely on the state agency physicians' opinions from 2021 despite subsequent imaging, physical therapy documentation, and treatment notes.

As to Plaintiff's arguments regarding the inclusion of Plaintiff's subjective complaints from the treatment notes, the Court partially addressed this above. The ALJ adequately explained why she discredited Plaintiff's subjective complaints and favored the objective medical evidence in making her assessment. The ALJ was not required to recount Plaintiff's reported medical history from each appointment. *See Terry*, 580 F.3d at 475 ("The ALJ is not required to address every piece of evidence or testimony presented[.]") The ALJ makes clear throughout the decision that she relied on the

outcome of the medical appointments in assessing Plaintiff's disability status. The outcome of the medical appointments—the diagnoses and treatment plans—take into account Plaintiff's reported history and symptoms along with the physical and mental status exams performed. Moreover, as to the mental health exams, the ALJ specifically identified that, "the claimant displayed soft and slowed speech, a sad mood and affect, irritability, impaired sleep, crying spells, social isolation, poor focus, and poor short-term memory." (Tr. 40). Several of these symptoms were not included in the mental status exams, but rather in the history and reports taken directly from Plaintiff. (*See, e.g.,* Tr. 691, 1320, 1345, 1372, 1386, 1398, 1406).

Next, while Plaintiff dedicates only one page to his assertion that the mental RFC is not supported, this argument has merit. The state agency psychological consultants both found Plaintiff's mental impairments non-severe with only mild limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself. One consultant found no limitations in understanding, remembering, and applying information, and one found mild limitations in that category. Those consultants did not impose any work-related limitations. But the ALJ found that the medical evidence, including Plaintiff's reports, substantiated greater limitations and found each of the state agency consultant's opinions unpersuasive. The ALJ also found Dr. Kombe's assessment of extreme limitations unpersuasive. As the ALJ explicitly rejected all available mental health opinions, they could not provide support for the ALJ's specific conclusions in the mental RFC assessment.

So, the ALJ attempted to create an appropriate limitation as to Plaintiff's mental

impairments and landed on restricting Plaintiff to "simple tasks in a routine work
environment and mak[ing] simple work-related decisions." In doing so, the ALJ
highlighted Plaintiff's soft and slowed speech, sad mood and affect, and irritability
balanced with objective medical findings like his cooperative behavior, average
intelligence, and intact judgment. The ALJ assessed a moderate limitation in
understanding, remembering, or applying information and mild limitations in the other
categories of mental functioning. But the ALJ did not discuss these symptoms in tandem
with the specific limitations imposed in the mental RFC other than to generically say the
"moderate limitation is adequately addressed by a limitation to simple tasks in a routine
work environment and simple work-related decision making." (Tr. 25-26).

Generally, an "ALJ is not required to rely entirely on a particular physician's
opinion or choose between the opinions of any of the claimant's physicians." *Whitehead
v. Saul*, 841 F. App'x 976, 982 (7th Cir. 2020). But "ALJs must rely on expert opinions
instead of determining the significance of particular medical findings themselves."
*Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018). And an ALJ's rejection of all expert
opinions can leave a troubling evidentiary deficit. *See Suide v. Astrue*, 371 F. App'x 684,
690 (7th Cir. 2010). Because the ALJ had no supporting mental RFC opinion evidence, it
was critical for her to articulate how the evidence supported each of the specific mental
RFC limitations assessed. She failed to do so. The decision contains no meaningful link
between the restrictions—performing simple tasks in a routine work environment and
making simple work-related decisions—and Plaintiff's assessed limitations. While the
ALJ highlighted some of Plaintiff's evident symptoms from the medical evidence, she

failed to explain how this mental RFC accommodated those symptoms or Plaintiff's mental health impairments. The ALJ's reference to psychiatric treatment records, Plaintiff's testimony, and the opinion evidence is not enough. Without being able to identify the ALJ's reasoning tied to each restriction, the Court cannot determine if the mental RFC was supported by substantial evidence.

In sum, the ALJ failed to build a logical bridge between the evidence in record and the limitations included in the mental RFC, which constitutes reversible error. On remand, the Court instructs the ALJ to construct an accurate and logical bridge between the mental health medical evidence and the conclusions in the mental RFC. In a situation like this, where there is an absence of valid expert opinions, an ALJ should summon an expert to review the record and offer an opinion grounded in the evidence. *See Daniels v. Astrue*, 854 F. Supp. 2d 513, 523 (N.D. Ill. 2012) ("Once the ALJ determined that [the treating physician's] opinions were insufficient and unsupported by the medical evidence, the ALJ had a duty to conduct an appropriate inquiry to fill that gap. What the ALJ could not do was fill in the gap on her own."). The Court encourages the ALJ to seek such an expert on remand.

## IV.    Did the ALJ fail to consider or evaluate Plaintiff's migraine headaches?

Lastly, Plaintiff insists that the decision failed to properly account for his migraine headaches. According to Plaintiff, the record contains ongoing complaints of severe, long-lasting migraine headaches with persistent throbbing and sensitivity stemming from his chronic neck pain. In a previous decision, another ALJ assessed Plaintiff's headaches as non-severe. But Plaintiff contends that the ALJ failed to mention these

headaches and factor them into the RFC.

In contrast, the Commissioner claims that Plaintiff failed to meet his burden to explain the limitations supposedly caused by his headaches not accounted for by the RFC. Instead, the Commissioner faults Plaintiff for failing to mention headaches at either hearing, including the most recent one in 2023. Moreover, the Commissioner points out that no provider opined that headaches cause any limitations, let alone for a consecutive 12-month period.

A claimant bears the burden of producing evidence of disabled functioning, and an ALJ may presume that a claimant who was represented by counsel before the agency made her best case for benefits. *See Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017); *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007) (explaining that "a claimant represented by counsel is presumed to have made his best case before the ALJ"). Thus, Plaintiff carried the burden to prove that he was disabled as a result of his headaches. At the hearing, counsel certainly could have asked Plaintiff to explain the disabling effect of his headaches, if any. But Plaintiff did not so much as mention headaches.

In the decision, the ALJ mentions one appointment where Plaintiff received medication for a cervicogenic headache. And it is true that Plaintiff mentioned headaches at several other medical appointments. But treatment of those headaches appears minimal throughout the medical records. Plaintiff points to no medical source opinion—and the record is devoid of any—that incorporates headaches as a symptom or diagnosis contributing to assessed limitations. Further, no provider has opined that headaches

Page 39 of 40

affected Plaintiff's ability to work on a sustained basis. As such, Plaintiff fails to demonstrate that the ALJ's failure to discuss his headaches impacted the physical RFC.

CONCLUSION

After careful review of the record as a whole, the Court finds that the ALJ failed to build a logical bridge between Plaintiff's mental health symptoms and the mental RFC limiting Plaintiff to simple tasks in a routine work environment and making simple work-related decisions. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **REVERSED in part** and **REMANDED** to the Commissioner for rehearing and reconsideration of the mental health evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is **DIRECTED** to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:    March 10, 2025**

**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**